Paul Messing, I'm here for the appellant Robert Earl Martin. I'd like to reserve two minutes for rebuttal if I could. May it please the court. This appeal of this bank robbery, conviction raises several discreet errors that were committed by trial counsel, all of which in turn relate to the misidentification of Mr. Martin as the bank robber in this case. I want to focus principally on the lay opinion issue. The admissible testimony, the admissible testimony in this case consisted of strikingly unreliable identification testimony by three witnesses. And I just want to take a moment to comment on that, because I think it's important to put it in that context. And there's some very unique qualities to the testimony in this case. We know, and I'll be very brief, and we lay it out somewhat succinctly on pages five to eight or nine of our of our brief. We know we're talking about three witnesses who gave generic descriptions, who gave descriptions that differed from each other, and who gave descriptions that did not match Mr. Martin. But what we know, and what's really interesting in this case, is that by stipulation and agreement, this robbery, this entire incident, took about a minute. There were 80 bank surveillance photographs taken, each of them, three quarters of a second. We know from the record and from the findings of the district court, and again this is laid out in our brief on those pages, that all three of these witnesses had a strikingly limited opportunity to observe. One of the witnesses saw Mr. Martin twice, is that correct? That's right, but we know from the findings of the district court and from the record that we're talking about one or two of these photos. And we also know that in the case of at least one, in part, a second witness, the view was obstructed during that time, not a full-face view. I tell you this to put it in context, and one other thing that I think is also important, is that there was an FBI forensic photographic examiner that was called by the defense. He was unable to make a positive identification. Exactly. And photos. And the jury saw that. And the jury heard that testimony. They did. It is in that context, or in that backdrop, that we view what trial counsel did in this case, and it was inexplicable. First, foremost, when the detective was on the stand, there was no objection, no motion in limine, despite the fact that it appears from the police reports that he knew this was about to happen. The detective was permitted to testify without objection that he identified, arrested Mr. Martin because he was the man depicted in the bank surveillance photograph. This is lay opinion testimony, and it is explicitly barred, not just by the federal rules of evidence, but by federal decisional law, and I'll get to that in a moment. The error was compounded, again, inexplicably, by defense counsel bringing out the fact that the detective had spoken to a lay witness, someone who was not in court and never testified, and someone who, it's I think quite clear from the record, knew Mr. Martin, that that was Mr. Martin. How did that come out? The name Edna Cooke? The detective referred to her as an informant, but how did that come about? Now, it was even odder than that, Your Honor, and I actually lay out the testimony on page 11 of the brief. The defense attorney, on cross-examination of the detective, after allowing this lay opinion testimony to come out, said, and you had received information that day, as you indicated, by indicating that you had the name Rob from a woman named Edna Cooke, is that correct? That is correct, and Edna Cooke had seen the photograph, that you have a copy of the photograph, referring to the bank surveillance photo, and it indicated to you that she thought that was Rob. Is that fair to say? That's right, and that's why we're here. These two, and pardon me, I'm going to go back to the court, address demeriment, which we cite in the brief. What they did is they took this ability of the jury to listen to the eyewitnesses, to eyeball the photos themselves. An FBI examiner could tell, but they could have looked at it themselves, but instead what we had for this jury is a witness, the kind of witness, an experienced police detective, with that, quote, special, or that aura of special reliability that the court talked about in Tukajina, to say this is the guy, this is the guy in the bank photographs. It invaded the jury's province as the fact finder, as to who to identify, so instead of being faced with the completely uncorroborated... Why wasn't the detective allowed to testify? How, I can't remember whether it was he or she... It was a she, actually. Yeah, ciphered. Why wasn't she allowed to testify as to how the arrest took place? She went into the barbershop, she, there were other people in the barbershop, as I understand it, and she identified Mr. Martin because she had seen the photograph, and because an informant had told her this guy Martin is going to be there. Well, what's inappropriate about that? Well, I think the court is correct that a police detective or officer can always provide some background as to why they made an arrest. Why isn't it background? Well, because they went beyond mere background into the point of introducing this impermissible lay opinion testimony not once or twice. What officers generally do in these circumstances, of course, is to say on information received, I arrested the defendant. Based on information that I had received regarding this defendant, I arrested her. Sometimes they do, and sometimes they're more explicit. Well, in this case, they were beyond explicit. They went to the point of not just saying I have information, I have good information, however they want to couch it, and however experienced detectives usually couch it. Your Honor, they went way beyond that, and they did something, and I think the law is very on page 22 of our brief. Have we ever adopted anything from Luke? Have we ever cited that case? Not that I found. I couldn't find it either. I did not find that as well, but I do know that the one case that the government cites, Jackson, is a case where the witness knew the defendant, and therefore, obviously, we're talking about apples and oranges. Let's assume you're right on that. Then the identification falls on the eyewitness identification and the juror's viewing of the tapes as well. Is that correct? Yes, that's correct. You say that's inherently unreliable. Well, what I say is that there's evidence of record and findings by the trial court that make clear that we're dealing with three identifications that are strikingly unreliable, that are very, very weak. This is not a situation, rather, where someone was in a bank for a long period, where witnesses had a good opportunity to observe, or good ability to observe, were able to describe, to recount, to recall the details, the description of the perpetrator in a way that matched the appellant in this case, or to provide any special unique features of the perpetrator that might have matched the appellant in this case. The walk is not a unique feature? The walk was never mentioned during the description. The walk was only mentioned when they got into the courtroom, and we don't know where that came about and how the jury may have viewed that. All we do know is that this jury didn't have the chance to make a fair and independent decision on their own. That function was usurped when a police detective was allowed to testify and to vouch for the identification of this photograph as that being Mr. Martin, and on top of it, was allowed to introduce on examination by defense counsel, and I find this inexplicable, was allowed to say that someone who clearly knew Mr. Martin was saying that was him in that very same photograph. And the reason that becomes important is, you know, I know the court's going to say, well, the jury can look at the photograph and make that decision themselves. We had a forensic photo examiner from the FBI, someone who's trained to parse out these photos, to measure the distance between the ears and the eyebrow and the nose and the lip. They couldn't make a match in this case, so we know that these photographs were hardly crystal clear and were hardly clear proof that Mr. Martin was the man depicted in those photos. By using Detective Seifert in the way that trial counsel permitted, and by allowing the additional corroboration of this Edna Cook to come in on questioning of the defense, the jury was robbed of the opportunity to make their own decision, and it raises the distinct and high probability that the wrong man was convicted of this crime. Good. Any other points you want to raise before? Like the medical evidence, I'm concerned, I'd like to hear what you say about what that, the trial attorney here is a very, very experienced trial attorney. The medical evidence, my understanding is, and maybe this is not agreed to by the government, let me know if it's not, but my understanding is that one of the two defense witnesses, either Pope or L, who was in the courtroom during the course of the trial and ready to testify, wouldn't have testified about a heart or a breathing problem that the Martin had. Is that agreed to by the government? As far as I know, there's never been any dispute, but we have two witnesses here, Pope and L, and we lay them out also on page 10, and they both would have been prepared to and were prepared to testify that Mr. Martin was quite ill, that he loses his breath very easily, even after a short walk, that he had heart surgery recently. He was a very sick man. And obviously the significance of this testimony is that he could not have done what the robber did, which was engage in the struggle, this very quick snatch and grab and run robbery that was very clearly committed by somebody else who was younger or at least far more physically fit. I should also say that at was also prepared to testify, and that's in the record as well, that the guy they know, Robert O. Martin, is not the guy in that surveillance photo. There was a hearing here. There was an opportunity for hearing in the district court. There was, and the government did not call the trial counsel, and frankly, neither did we. Well, whose burden is it to present that evidence? We don't think it's our burden to call the trial counsel there. Why not? It's done all the time. It's done where there is a situation, which I think is not present here, where there might be some reasonable tactical basis for trial counsel to have done something or refrain from doing something. I can't say that. I thought in this situation that neither witness could have testified that Mr. Martin was present in the barbershop during the time that the robbery was committed. That's right. It was a flawed alibi to witness. Isn't that pretty reasonable? Well, it would have been reasonable not to use them, I think, as alibi witnesses, and I'm not, I didn't argue that strenuously, obviously, here, but I do think- It's in your brain. Well, what I thought was important is exactly the points that Judge McKee was making, that these witnesses were corroborative, not an alibi, because it was conceded that they couldn't account for Mr. Martin's whereabouts every minute. He was going in and out of the store at various times. But what was important is what we've already discussed, his medical condition, his inability to do that which does backdrop or do anything. I understand that. Now, why is it not your burden to call the trial counsel? Because I don't believe we have a burden where there's no reasonable chance that there is a tactical decision that could be explained here. What possible, and I don't think that the that there was a reasonable tactical basis for the trial attorney to have not objected to what Seifert has said, to have not refrained from bringing out this Edna Cook identification, and to have not to put on witnesses who would have undermined, in critical respects, the government's case. Now, they make arguments that the identification was admissible, citing Jackson, which I think is an opposite. They make arguments that there were reasonable grounds for counsel to introduce the Edna Cook identification because it somehow undermined Detective Seifert identification. But that's a secular argument. The argument is that they were trying to, in fact, that he was trying to undermine the identification argument that she had been put on notice ahead of time. Is that accurate? I think that the government makes what is a circular argument that doesn't add up because it's obvious that the Edna Cook identification doesn't undermine Seifert's identification of the photo. It strengthens it. And that's why it was so horribly damaging in this case. How far is the bank from the barber shop? Is that in the record? I don't know if that's in the record. They are not in different parts of the city, but I don't know how far exactly. Yes, Judge Noonan. I think you anticipated, Mr. Maxinewood. John, try to get closer to the microphone, please. They had the opportunity to compare what the FBI agent said to what they saw. Now, we're not saying whether any deficiency you point to would have made a difference, and I don't see how it would have made a difference. The jurors having the FBI agent tell them one thing, which is pretty impressive, and making their own observations themselves came out that he's the person. Judge Noonan, I understand what you're saying. On the other hand, what I think is critical here is that instead of hearing this dubious eyewitness testimony and looking at the photos themselves, what happened here as a result of trial counsel's blunders was that the jury was now given not the opportunity to just eyeball these photos, but they were given something that the government didn't have in this case. They were given corroboration. They were given secret opinion with that of special reliability that an experienced police detective has, and they were given this corroboration of Edna Crook, never appeared in court, ran hearsay. The argument by the government that this is effect on the listener is a red herring. The effect was on Seifert. He was the listener, and that corroborates only his impermissible identification. So the jury function was usurped by that, Judge Noonan. That's our position. Thank you very much. We'll have you back. Good afternoon, Your Honor. May it please the court, my name is Mary Crawley. I represent the government in this case. There's a, you can put the whole, underneath there's a little great crank there. Oh, okay. Can we move it down? Okay. Bring back the old one. Well, I'll just try to stand up straight. We should get some law books that you can stand. I don't, I can't say that the government agrees with Mr. Messing's description of the eyewitness testimony, because I thought I heard him say that the trial court had made findings about it being unreliable. And in fact, the court below had upheld the jury's verdict against a claim of insufficient evidence and had made findings, which I believed were quite contrary, that the differences among the eyewitnesses' testimony were on minor points and that a reasonable jury could have accepted the eyewitness's testimony in conjunction with all the other evidence and relied upon it to find Mr. Martin guilty. The differences in the testimony weren't, at this time, even that big a deal, but their identifications were, if you take the numbers out of it, they're basically saying someone of average height and average weight. Yes, Your Honor. That's the most folks, by definition, that's a whole Well, there were additional things that made these, made their descriptions applicable to Mr. Martin, and those included the fact that he was wearing a baseball cap, the fact that he needed a shave or looked scrappy. The baseball cap. How does that help you with that? Because the baseball cap was never found. That's correct, Your Honor. That's correct, Your Honor. But let me back up and mention, I mean, the baseball cap itself is depicted quite clearly in the surveillance photographs. And they never mentioned, in referring a description to the officers, they never mentioned the logo on the baseball cap. That is correct, Your Honor. They never mentioned the facial hair. They did mention facial hair, Your Honor, and they did mention the baseball cap, but the government's response on the question of the logo was, I think, reasonable. Again, these were three women who may or may not have been sports fans. That may have been unimportant to them. They wouldn't have to be able to handicap the Super Bowl. If you live in Philadelphia and you see a green hat with a white bird on it, you know that's not the white dove of peace on that hat. Your Honor, I will defer to the court, but as a non-sports fan myself, it can happen. And we believe that the district court's findings, more importantly here, were correct. But getting back to the central issue of the case, and not conceding at all that the eyewitnesses' descriptions were unreliable, let alone strikingly unreliable, this case is and has always been about the surveillance photographs. Our office tries many cases of unusual to have a case in which the surveillance photographs are as clear as the ones in this case. How clear could they have been if you've got a person whose job it is to do forensic examination of photographs? He looks at the photographs. He looks at the defendant and says, I can't be sure that guy is the person in the picture. That wasn't precisely what he was doing, Your Honor. He was a forensic photographic examiner, and he was comparing an arrest photograph of the defendant with the surveillance photographs. And those are included in the record for the court's perusal at pages three and four of the record. Tell me the relevance of that testimony. Why was he testifying? He was testifying because the defense called him to testify, and I believe the defense theory was a reasonable one in calling him that this expert had a doubt, so should they. Because the defense had a doubt. That was the surveillance photographs, because they could bring out the differences, however minor, between the various descriptions that the eyewitnesses, the three eyewitnesses gave, but you cannot cross-examine a photograph. And so defense counsel had a hard time in this case. He had to try to convince 12 people that what they saw in front of them, and I have brought originals with me to court for the court because they are so clear, and they lose somewhat, a little bit of clarity in being copied for the record. But he had to convince 12 people that what they saw in front of them simply wasn't Mr. Martin when they had him there to compare with those photographs. The surveillance photographs, I would argue, have, they drove the way that trial counsel tried the case, and they are still driving this case today. Now, as to the first claim of ineffectiveness, the government does not concede that the, as counsel had stated, that the government put on the arresting officer, the arresting detective, in order to put improper identification evidence before the jury. That was not why we called her. We called her in order to tell the jury how Mr. Martin was arrested. This was clearly not the most important part of our case, and it was not stressed by the government at that time or later. But even if you, except for the purpose of argument, Mr. Messing's claim that this was inadmissible evidence, that does not, and Judge Shapiro I don't think he's misinterpreting. I don't think Mr. Messing's argument is that it was improper to call Detective Seifert to give testimony or explain how the arrest came about. He's saying that what happened as a result of that and the way it was done basically allowed an expert identification into the record that didn't otherwise get there. Well, when I was trying to say, Your Honor, is that even if you accept his claim that the detective saying, I arrested him as opposed to someone else in that barbershop because he looked to me like the guy in the photo, even if you accept that that would otherwise be inadmissible, we believe counsel made a strategic decision to let that evidence in. How do you understand that? What would be the strategic advantage of allowing a professional criminal investigator to identify a client at trial? What would be the thinking for that? It is, it would have been and was in keeping with his, his, the way he tried the case, his tactics throughout, and that was to sort of divide the evidence up into two parts. There are the eyewitnesses on the one hand and then there are the surveillance photographs on the other to whittle away the eyewitness testimony to say that it is simply not credible, not worthy of belief because the time period during which they had to observe was so small. And then to focus on what he was arguing was the only possibly helpful evidence and that was the evidence that showed that even though the surveillance photographs clearly showed Mr. Martin, it was really, it was not him. And so this was in keeping with that strategy, it furthered the strategy, and it was a reasonable strategy in a case where the surveillance photographs were very clear. And that is that you make the same argument through this witness, through a lay witness, that even a trained observer such as the detective could not that it was Mr. Martin without the help of someone else. And that was, we believe, the purpose of the cross-examination. You see very clearly, it is your client. She believed that it was him. That's why she had arrested him as opposed to somebody else in the barbershop that day. And keep in mind, Judge, this was a very small part of a two-day trial. This was not a big thing at the time and it was not something that the government stressed later on. It was referred to by the government in the closing. There were six lines out of a ten-page closing. But this was not a large part of the evidence because the government, as well as the counsel below, focused on what was the most important evidence and that was the surveillance photographs. So Ms. Miller, help me understand, at least from my mind, we haven't discussed the case. From my mind, the most troubling part of this is the one or two witnesses who could testify about a medical condition that, if the jury accepted, would make it very difficult for the defendant to have grabbed the security guard and dragged him. Your Honor, that was not something that the government has ever agreed to, that they would be proper witnesses to testify about his medical condition. And we do not know, because they were not called, what it would have been, but the government would have objected vigorously to them giving medical testimony. But what would a medical expert have to say? Would it be, have you seen him conducting physical activities? Have you seen him during the course of his work in the barber shop when he's had to engage in physical activity? What, if any, impact or reaction did he have that physical activity? Just to get out the wheezing and the shortness of breath, you'd have to be a medical expert for that, and I assume that's what they would have done. I, again, it is not clear from the record, and it, what is clear, that is that neither, again, the focus at trial was whether, on whether these gentlemen could serve as alibis, and it was clear from the, it was clear that they could not. There were reports of interview that the government submitted at the evidentiary hearing on the 2255 motion, that showed that both men were not in a position to say that he was there that day, and furthermore, one had a lengthy criminal record which would have been brought out on cross-examination, so that we believe that was a strategic decision that was well within the balance of professional conduct. Now, this, all of the, what you just said, all of that appears in the record? As a result of the habeas proceeding? What part of what I had said, Your Honor? All of it, any of it. Your Honor, I, my, the record on the supplemental appendix is very long. It contains the entire trial record. No, no, what I want to know is, we've had representations about these two witnesses. Yes, Your Honor. Your Honor, the government. The representations appear where? Your Honor, the government did not interview these gentlemen. We do have in the record the reports of the FBI, reports of interview of them, and. Wait a minute, the government did interview them, but the FBI didn't? Your Honor, I'm sorry, I am referring to myself. I am being unclear. There are in the record both, if I may have a moment, Your Honor. At pages 400, 401, and 402 of the record, there are the reports of the FBI's interview of the two alleged alibi witnesses, and there were, I believe, but I don't know the place in the investigative reports of their, of what they would have said. Now, you presented this in the habeas. I did, Your Honor. All right. Now, what evidence, if any, was presented with respect to the medical condition of Mr. Martin? None, Your Honor. All right, so all we have is a, representation by defense counsel that this was, in fact, the case, and that these two witnesses would have testified about it. That is correct, Your Honor. All right. Now, who has the burden of going forward with this? The defense has the burden on habeas of showing that the counsel at trial, that their conduct fell below the standard in struggling against Washington. Okay, well, Mr. Messing said on this particular issue, you have the burden of going forward. Your Honor, I would respectfully disagree because the government has to, in government's view, could have been taken further and so, and again, the government has done so. We believe that it is a reasonable strategy. It, what, perhaps not every lawyer would use it, but it's not, it is not incredible. Well, as I gather that Mr. Messing is saying that you have, you have not put forth anything with respect to the medical history, and that was your burden to do so. I don't think that's correct, Your Honor, because the question on that third issue of whether there was, whether it was ineffective assistance not to call the two alleged alibi witnesses is whether or not the counsel made a reasonable decision after a proper investigation, and I believe that Judge Shapiro found as a fact in her opinion below that there had been a reasonable investigation, a proper investigation conducted, and she concluded further that the decision not to call those two witnesses was reasonable, and this Court is, of course, not bound by that, that further decision, but the factual finding, we believe, is accurate, and that was, we believe, the defense burden to go forward on. What I'm still not sure whether you present, was it, did you have a burden to present something on the medical testimony? We do not, the government believes that we did not have such a burden, if I may have the, if I may have the Court's permission to brief that further, but it was our understanding at the time of the habeas evidentiary hearing that we did not bear such a burden, and again, it was not the focus at the time of the defense argument. Are you saying there was no medical testimony? There was no medical testimony, and it was not, we are, I'm saying that it wasn't presented to the district court in such a way that it was, that the district court was asking one side or the other or expecting from one side or the other any medical evidence at all, but I would point out for the Court that there was an evidentiary hearing held here, that trial counsel was under subpoena by the government, and the defense counsel chose not to call him, and we believe that this is what makes Judge Shapiro's ultimate finding here absolutely correct, and that is the Court stated that this was or could have been a reasonable, a reasonable tactic, or I'm using, I'm not using the Court's words, but that the defense had failed to carry its burden of showing otherwise, and we believe also that there is absolutely no possibility of prejudice on this record, again, even if, even if ineffective assistance is, is assumed, given the clarity of these surveillance photographs, which the jury did, could and did examine for themselves, and as the Court's aware, they convicted Mr. Martin shortly after having requested and received from the trial court another opportunity to see him stand in front of them wearing a baseball cap, which had an Eagles logo on it, Your Honor. Thank you. Good. Any, John, any questions? Good. Thank you. I'm sorry. Judge McKee? Good. Does the, does the defense counsel have any objection to our seeing the photographs? Absolutely not. The FBI forensic examiner saw them. I think you should as well. Let me just make a couple of very brief comments. Let me say, am I, on the presumption, on the burden thing, I understand, well, I think I understand correctly from Ron, on the burden thing, you're saying that there is a presumption that arises under Strickland that counsel is making strategic decisions in the best interest of his client. However, in this situation, and it's up to defense counsel to rebut that presumption, and you've got the burden of doing that. Exactly. But in something like the testimony of Seaford, where defense counsel brings out an identification of an expert witness, arguably, that that is not the kind of circumstance that would give rise to the presumption. Therefore, there's nothing for you to be brought. Exactly. Because otherwise, you know, in the petitioner, in a habeas action, would have to put trial counsel on the stand to construct a straw man, you know, to explain the inexplicable. Once this is on the record, and I think the same is true, and the government kindly called the court's attention to where in the record the FBI and private investigator reports were from Mr. Polk and Mr. L. All this testimony was there. We established that there was this testimony. This testimony was not expert testimony by Mr. Polk. They were going to merely testify to their observations. The government has said this case is all about the surveillance photographs, that it's as clear in this case as it can be from the surveillance photographs. We have an FBI forensic examiner who could make heads or tails of these. What I'm saying is right now, there's nothing on the record about Polk and L's potential testimony about the observations of his limited, limited. Oh, there is, in fact, yes. Oh, yes. We put in their interviews from the investigator, and I believe the FBI also interviewed them as well after they got noticed. That's all on the record in this case. I think starting is for cross-examination. They were not called their subpoena. That's right. But that's certainly on the record of this case. You're on. I'm sorry. What is on the record? The statements they gave outlining all of this to the FBI and to a defense investigator, and I believe that starts at page 399. This was on the initial case. Yes. This was not on the habeas case. Well, it's part of the record of the lower court and part of the record of the habeas as well. All right. What was done with it in the habeas case? It's part of the record, and we argued that there was no sound tactical basis for not having introduced all of these discrete pieces of evidence. There was no rebuttal to that from the government. It would put a habeas petitioner in an impossible burden under these circumstances to have to call a defense attorney. It happens all the time? It happens all the time in situations, Your Honor, where there is a reasonable tactical basis that can be inferred, or there's some argument of one. I mean, here now, the government has submitted I don't know how many briefs that come up with not one explanation. Well, one of the witnesses apparently had a lengthy criminal record. Sure. Witnesses testified for both sides with lengthy criminal records. People were convicted on the basis of the testimony of people with lengthy criminal records. You're a good advocate, Mr. Messick. I appreciate that, but it is, in fact, the nature of criminal practice. I know, no question about it, and you're right, but the fact is that may have been a tactical reason or may not have. There was one witness. But nobody called the defense attorney to find out? I understand that, but of course, that only disposes of one witness, Your Honor. And the other witness was also the witness who was prepared to testify as reflected in the reports that he looked at that bank surveillance photo, and he went a little further than the FBI examiner. There is a fundamental problem in this case. We have someone serving life on a bank robbery. We have identification testimony that is generic at best. I'm from New York. I'm a Jets fan. I got to tell you, an eagle's hat is an eagle's hat, and to stick the hat on the guy and then have him identified in front of the jury, I can't imagine anything quite as suggestive as that. This jury had taken from them the opportunity to make a fair decision in this case. Any further questions? Yes, sir. Yes, John. Hold on just a second. Mr. Messing, I agree with you that it's a very difficult case, but we're going to be trying, and I don't understand why you didn't put the counsel on to explain his decision. Once a lawyer is put on, you get to try several things. The lawyers are amazingly genius, and I can't believe he would have been mute. You can't imagine anything. I know, but he could have, and you gave up the opportunity to demonstrate his reasons of bad or good. Your Honor, I understand what you're saying, and I think there are many circumstances in stand here and say, you're right, I should have, but in a case such as this, where experienced government counsel, having had all this opportunity to come up with some reasonable basis for these so-called tactical decisions, has failed to do so, I think it's a red herring in this case. I truly do. Mr. Messing, thank you very much. The case was well argued. We will take the case under advisement. The court will take a brief recess. We'll be back in five minutes. The next matter is Cantor v. Barilla.